UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
MAN FERROSTAAL, INC.,                   :
                                        :          07 Civ. 6269 (DLC)
                      Plaintiff,        :          09 Civ. 2408 (DLC)
                                        :
          -v-                           :          OPINION & ORDER
                                        :
M/V AKILI, her engines, boilers,        :
tackle, etc., AKELA NAVIGATION CO.,     :
LTD., ALMI MARINE MANAGEMENT SA, SM     :
CHINA CO. LTD.,                         :
                                        :
                      Defendants.       :
                                        :
--------------------------------------- X

Appearances:

For the plaintiffs:
Steven Potter Calkins
Harold M. Kingsley
Kevin Thomas Murtagh
Kingsley Kingsley & Calkins
91 West Cherry Street
Hicksville, NY 11801

For the defendants M/V Akili, Akela Navigation Co., Ltd., and
Almi Marine Management SA:
Vincent M. DeOrchis
Richard Brett Kelly
John Alan Orzel
DeOrchis, & Partners, LLP
61 Broadway
Suite 1900
New York, NY 10006

DENISE COTE, District Judge:

       This action arises out of a shipment of thin-walled pipe

purchased by plaintiff and shipped aboard the M/V Akili

("Akili") in 2006 from Shanghai, China to New Orleans,

1

Louisiana.  Plaintiff MAN Ferrostaal, Inc. ("Ferrostaal")
alleges that the pipes were damaged due to improper stowage
during transport.  A nonjury trial was held in this action on
January 20, 2011.

Pursuant to this Court's procedures for non-jury trials,
the parties submitted the direct testimony of their witnesses by
affidavit and their documentary evidence with the pretrial
order.  The plaintiff submitted direct testimony by affidavit
for witnesses Martin Heyn of Ferrostaal and Severo Calima, a
marine surveyor who conducted the discharge and damage surveys
of the cargo upon its ultimate arrival in Pennsylvania.  In
addition, plaintiff has submitted as exhibits the depositions of
Steve Drobny of Ferrostaal; Lu Jiangming, the marine surveyor
who examined the cargo pre-loading and during loading; and
Matthew Salkeld, the marine surveyor who inspected the cargo
upon arrival in New Orleans and during discharge to the river
barge.  The defendants submitted as an exhibit the deposition of
Lu Jiangming.

Based on the trial evidence, the following are the Court's
findings of fact and conclusions of law issued pursuant to Rule
52 of the Federal Rules of Civil Procedure.

BACKGROUND

I.   The Parties

Plaintiff Ferrostaal is a Delaware corporation engaged in the trade and import of iron and steel products into the United States for resale.  Since being purchased in 2007, it has operated under the name Coutinho & Ferrostaal, Inc.

Defendants are the Akili, a bulk carrier cargo ship doing business as a merchant vessel in the international common carriage of goods by sea; Akela Navigation Co., Ltd. ("Akela"), the registered owner of the Akili; Almi Marine Management SA ("Almi"), the vessel manager for the Akili at all relevant times; and SM China Co. Ltd. ("SM China"), the voyage charter party for the relevant shipment of cargo.  SM China has been dismissed for the plaintiff's failure to serve it.  Akela and Almi contest that there is personal jurisdiction over them.[1]

II.  The Business of Ferrostaal

In relevant part, Ferrostaal's business is to receive orders of steel from customers in the United States, and to then procure steel from international suppliers and arrange for its transport to the customer.  Its biggest source of steel is manufacturers, such as pipe mills, from China, although Ferrostaal procures steel from many other nations as well.  When

---

[1]    The motion by Akela and Almi to dismiss for lack of personal jurisdiction is pending; as a result of this Opinion, it will be dismissed as moot.

3

sourcing pipe from China, the goods are sold FOB vessel,[2] so Ferrostaal arranges for the transportation by chartering or subchartering a vessel.  Ferrostaal typically arranges for a survey of the goods both at the time of loading and unloading to inspect the condition of the material.

III. The Transaction at Issue

The subject cargo in this case is 9,960 thin-walled steel pipes manufactured by Zhongqing Petroleum Steel Pipe Co., Ltd. (abbreviated "ZQ" in the shipping and survey materials) in China, and purchased by Ferrostaal for McJunkin Appalachian Oilfield ("McJunkin"), whose business is "pipe coating" in West Virginia, Pennsylvania and Ohio.  This steel pipe was grouped into 996 packages under the bill of lading SMAGAL-607-SHNL-03 and was destined for unloading from the Akili at New Orleans, Louisiana.

Ferrostaal executed a part cargo charter with SM China on June 8, 2006 for the carriage of the steel pipe from Shanghai ("Voyage Charter Party"), with a freight rate of "$68.00 per MT FIO S/L/S/D 1-2," meaning that Ferrostaal had responsibility to pay for "cargo to be loaded, stowed, lashed, secured, and dunnaged."  The Voyage Charter Party included an "Owners' Responsibility Clause" that put responsibility for loss "caused

---

[2]      "FOB Vessel" signifies that the "title to the goods was to pass when the goods were loaded on board the ship." Berisford Metals Corp. v. S/S Salvador, 779 F.2d 841, 842 (2d Cir. 1985).

by improper or negligent stowage, or discharge, or care of the goods" on the "Owners" and specified that "Stowage is to be under the Master's supervision and responsibility as Owners' agent" and "Owners to be responsible for cargo loss and damage according to Hague-Visby rules." The Voyage Charter Party further clarified that the "Owners," not the stevedores, would be responsible for stowage, lashing and securing of cargo. Under the Voyage Charter Party, SM China is defined as the "Owner." All claims for loss or damage to the cargo were to be governed by Hague-Visby rules regardless of any contrary rules in the Charter Party or any bill of lading.[3]

The Akili was nominated for the purpose of transporting this steel pipe from Shanghai, pursuant to a charter between Akela and non-party Seyang Shipping Ltd ("Seyang") signed on June 19, 2006 ("Time Charter Party") and in effect for a period of four to six months. Pursuant to the Time Charter Party, Seyang chartered out the entirety of the Akili. The Time Charter Party specified that all bills of lading under the charter would incorporate "the General Clause Paramount or U.S.

---

[3]     COGSA is the United States's incorporation of the Hague rules governing bills of lading. The "Hague-Visby rules" are these same rules as incorporated in COGSA, with newer amendments that allow a higher recovery per package in cargo claims. Kreta Shipping, S.A. v. Preussag Intern. Steel Corp., 192 F.3d 41, 46 & n.5 (2d Cir. 1999). The higher recovery allowed by that amendment is not relevant here, so for the purposes of plaintiff's claims, COGSA and the Hague-Visby rules are identical.

or Canadian Clause Paramount whichever applicable as attached."[4]
It also provided that the Akili's captain would be under the
orders and direction of Seyang and sign bills of lading for
cargo.  Seyang would load, stow, secure and discharge cargo at
their expense from the Akili.  In turn, Seyang subchartered the
vessel to SM China, with whom plaintiff contracted.

IV.  The Survey and Loading of the Subject Cargo in Shanghai

     Ferrostaal arranged for Lu Jiangming ("Lu"), a marine
surveyor in Shanghai with many years of experience as a
stevedore, stevedore foreman, and marine surveyor, to conduct
the loading port survey of the cargo in Shanghai.  Lu had
performed cargo surveys in the port of Shanghai for Ferrostaal
and other companies since 1995.  Ferrostaal sent Lu a packing
list for its cargo aboard the Akili, including information about
the type and quantity of pipe to be transported.  A final
packing list was sent to Lu by the Chinese steel mill that
supplied the pipe.  Lu prepared a survey report dated July 12,
2006, first examining the pipe at the open stowage yard in the
port on June 22, 2006, and then attending and examining the
process of loading and securing the cargo onboard the Akili.

---

[4]     A "Clause Paramount" specifies the governing law regarding
the liability of parties to a bill of lading or charter party.
See, e.g., Sompo Japan Ins. Co. of America v. Union Pac. R. Co.,
456 F.3d 54, 56 (2d Cir. 2006).  A "U.S. Clause Paramount"
incorporates COGSA.  Associated Metals & Minerals Corp. v. S/S
Jasmine, 983 F.2d 410, 413 (2d Cir. 1993).

Lu's inspection of the subject cargo at the open stowage yard found no physical damage other than rusting, unlike some other pipe he surveyed for Ferrostaal that is not at issue in this lawsuit and which did suffer from physical damage before loading. He also noted that the mill did not add orange caps to the ends of most of the pipes, although Lu believes that these caps do not play a function in protecting the pipes from physical damage.

Lu became concerned about the stowing plan from the Akili, which indicated that the pipe at issue here was to be stowed under thicker-walled pipe bound for Houston, Texas. The roughly 1,500 metric tons of thin-walled Ferrostaal pipe were stowed below 2,600 metric tons of non-Ferrostaal pipe. Lu believed that this weight on top of the thin-walled pipes would cause denting of the pipe walls. He also had concerns that the pipe was being stowed in a forward hatch not generally favorable to transporting such long pipe.

On June 23, 2006, before loading commenced, Lu suggested to Captain Zhong, the "supercargo" (an agent of SM China who had authority over cargo loading and stowage), that the thin-walled pipe at issue be loaded on top of the Houston-bound thick-walled pipe. Captain Zhong rejected this suggestion. In Chinese ports, it is customary for the time charterer (for whom Captain Zhong worked) to have authority over loading procedure. As a

consequence, Lu did not inform others of his concerns.

The Akili was loaded with the Ferrostaal pipe at Terminal 10 in the port of Shanghai, a terminal that handled lots of pipe shipments at the time, from June 23 to 27, 2006.  A Chinese state-owned company that was run by or affiliated with the Shanghai Harbor Bureau conducted the loading of the pipe.  Lu testified that he saw no damage done to the pipes during loading in the vessel's cargo holds, and that the ship's officers and supercargo used dunnage between tiers of pipe, including above the bundles of pipe.

Another 729 metric tons was loaded in hold 5 above the subject cargo at the Akili's second loading port in China, Xingang.  When the Akili finally set sail on its voyage to the United States, 21% of the total cargo it carried was Ferrostaal's cargo, a subset of which was the thin-walled pipe at issue here.

V.   Discharge of the Subject Cargo in New Orleans

The Akili had two ports of call to discharge its cargo, the first in Houston, and the second in New Orleans.  The Akili arrived in New Orleans on September 2, 2006.  The steel pipe at issue was discharged from the Akili in New Orleans onto a barge for transport upriver to Pennsylvania.

Ferrostaal hired surveying firm Capt. I.S. Derrick LLC ("Derrick") to conduct the outturn survey of the cargo,

observing the cargo both in the Akili upon arrival and periodically as it was discharged from the vessel.  Derrick surveyor Matthew Salkeld ("Salkeld") conducted this survey from September 4 through 8 and September 10, 2006, which included the days that the stevedores unloaded Ferrostaal's cargo.

Salkeld issued a report on October 4, 2006, that the cargo in question had been bottom-stowed in hold five of the Akili, underneath and adjacent to other cargo that had been discharged in Houston.  Although Salkeld could not inspect all pieces of pipe in detail, he reported various types of damage, including signs of contact with the forward bulkhead, numerous flat ends, broken securing bands and likely compression damage.  Salkeld believed that this compression damage would have resulted from the weight of the cargo stowed on top of the thin-walled pipe, approximately 3,340 tons, as well as improper and unnecessary use of dunnage which would have concentrated the weight from the overstowed cargo on the pipes below.  Salkeld noticed numerous signs of the effect of such weight, such as smashed and disintegrated dunnage and pipe portions with rust rubbed away by the dunnage.  Salkeld's expert opinion was that the stowage and use of dunnage were both examples of poor stowage practices. His report also noted that many of the pipes were missing end protectors, but was not concerned with this, as these plastic caps only protect against minor nicks or bevel damage, not flat

9

ends or other more serious physical damage.  This report was the first time Ferrostaal was notified of the damage to the pipe.

Salkeld noted no damage done to the cargo as the stevedores in New Orleans discharged the pipes to the river barge.  He also noted that the stowage and dunnage used in the barge were proper for the thin-walled pipe.

VI.  Discharge in Pennsylvania, Damage Survey and Repairs

On October 10, 2006, the barge with Ferrostaal's cargo arrived at the CSI River Terminal in West Elizabeth, PA.  Due to a delay in communication, Severo (Bert) Calima ("Calima"), another Derrick marine surveyor, was unable to start his survey until October 17, 2006.  Therefore, he hired an experienced Pittsburgh marine surveyor, John Coletti, to begin the survey. The survey by these two individuals was conducted from October 11 to 17, 2006, and confirmed the damaged condition of the steel pipes, including damaged pipe ends, damaged bevels, wall dents from compression and bent pipe.  In Calima's expert opinion, the damage to the pipes was consistent with the concerns communicated to him by Salkeld after his New Orleans survey and with the report by Lu, who had been concerned with improper stowage of the pipe.  Port personnel also informed Ferrostaal and McJunkin about the damage to the steel pipes.

In October 2006, Ferrostaal and Derrick informed Biehl & Co., the Akili's agent in New Orleans, and Empire Stevedoring

10

(LA) Inc., the stevedore company in New Orleans, about the damage and the scheduling of a joint survey at the CSI River Terminal.  After neither party accepted the invitation to join in the joint survey, Calima again notified the ships' agent and stevedore company when the repairs were scheduled to commence and to be completed.

Representatives from Ferrostaal and McJunkin surveyed the pipes along with Calima on October 19, 2006, and found that many of the pipes suffered damage making them unacceptable for their intended use.  Calima's observation of the damage, based on his many years as a licensed surveyor, was that the pipe wall dents were caused by improper stowage, with dunnage improperly used between tiers of pipe bundles, not enough dunnage used to protect the pipes from contact with the ship's side frames, and excessive compression while onboard the ship.  After this survey, Ferrostaal, McJunkin and Calima agreed that repairs would need to take place on site at the CSI River Terminal.

After Calima determined that no local, qualified repair operation was available to commence repairs on the pipe, Ferrostaal hired Houston Tubulars, Inc. ("HTI"), the operations of which are centered in Texas, to conduct the necessary "drifting" of the pipe to assess damage as well as repairs at the CSI River Terminal.  This work began on January 9 and was completed on February 22, 2007.  Empire Stevedoring and the

ship's P&I Club sent surveyors in March 2007 to conduct joint surveys with Calima of the remaining unrepaired pipe.

After all repair work had been completed, McJunkin paid Ferrostaal $1,169,755.30 for the non-damaged and repaired pipe. The owners of CSI River Terminal paid Ferrostaal $100.00 for the non-repairable pipe at salvage or scrap value. Ferrostaal paid HTT $228,531.50 for repair work, $56,569.48 for work crew and related expenses and $977.34 for the inspection and coordination of the repairs by the president of HTT. Calima reviewed these invoices, which totaled $286,078.32, and provided Ferrostaal his expert opinion that this amount was fair, reasonable and necessary.

Calima issued his final damage survey on June 4, 2007, along with his opinion that the damage to the pipes was caused by improper stowage onboard the Akili as well as improper handling during the loading and discharging. In his opinion the damage was not caused by any conditions of the river barge transport. Ferrostaal paid Derrick $26,657.79 for its employee's work conducting the damage survey and report.

VII. Ferrostaal's Claim for Loss

Ferrostaal filed a claim with their underwriter for the amount of loss, which is calculated using the surveyor's damage survey report and invoices for repair of the material and services by the surveyor, and by subtracting the amount received

for sale of salvaged material on the secondary market.  The
claim to the underwriter, before a $1,500 policy deduction, was
$313,429.96.

Defendants' Protection and Indemnity ("P&I") Club's
representative made an admission that the damage to the cargo
was caused by incorrect stowage known by the supercargo at the
time of loading.  The P&I Club's marine surveyor issued a report
finding that the process of repairs by HTI was necessary to
restore the pipes to a condition acceptable for their intended
use.

PROCEDURAL HISTORY

Ferrostaal filed its verified complaint on July 9, 2007, to
which defendants Akela and Almi filed an answer on August 30,
2007.  Akela and Almi also filed cross-claims against SM China
on December 12, 2007.  In an effort to secure the participation
of SM China, Akela and Almi petitioned and received permission
to pursue a "Rule B" maritime attachment against SM China.  The
attachment was served on various New York financial institutions
commencing on December 20, 2007, but was not successful and has
been vacated.

On January 23, 2009, Akela and Almi moved to dismiss the
complaint for lack of personal jurisdiction.  In February 2009,

13

the in rem portion of this case was severed and transferred to the Eastern District of Louisiana because the Akili was expected to make a call in New Orleans and be amenable to arrest.  After the P&I Club of the Akili tendered to plaintiff a "Letter of Undertaking" guaranteeing satisfaction of any amount under a certain limit for which the vessel is found liable, the in rem action was transferred back to this District in March 2009 and consolidated with the in personam action.

This action was transferred to this Court on October 1, 2010.  After a pre-trial conference on December 10, 2010, the parties agreed to proceed with a trial on the issue of liability, leaving the motion for personal jurisdiction to await the outcome of that trial.  The nonjury trial was held in this action on January 20, 2011.  In addition to receiving testimony on the issue of causation and damages, proposed conclusions of law about the liability of the defendants Akili, Almi and Akela under the relevant maritime law were submitted.


DISCUSSION

I.   Applicability of COGSA

The Carriage of Goods by Sea Act of 1936 ("COGSA" or the "Act"), 46 U.S.C. §§ 1300-1315, generally governs the responsibilities of carriers involved in the shipment of goods into the United States from ports outside of the United States.

Under the Act, a carrier may not disclaim all liability for the duty to discharge properly the goods it carries.  <u>Assoc. Metals & Minerals Corp. v. M/V Arktis Sky</u>, 978 F.2d 47, 49 (2d Cir. 1992); <u>Leather's Best, Inc. v. S.S. Mormaclynx</u>, 451 F.2d 800, 807 n.5 (2d Cir. 1971).

COGSA imposes on ocean carriers a duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."  46 U.S.C. § 30701.  The statute applies "from the time when the goods are loaded on to the time when they are discharged from the ship."  <u>Id.</u>  Thus, "COGSA forbids a ship owner from contracting out of liability for improper stowage of cargo."  <u>Arktis</u>, 978 F.2d at 50.

COGSA does not apply, however, when the carrier at issue has acted as a private carrier, rather than as a common carrier. This is due to the long-standing distinction made in maritime law between public carriers -- who held themselves out to carry cargo from the public, and who have broad, non-negotiable duties to shippers of goods -- and private carriers, whose liability may be limited by agreements between the parties.  <u>Nichimen Co. v. M.V. Farland et al.</u>, 462 F.2d 319, 326-27 (2d Cir. 1972). This policy consideration led to the protections provided shippers under COGSA and the explicit mention that the Act was

"not applicable to charter parties." Id. at 328;[5] 46 U.S.C. §
30701.  In actions for damage to cargo by shippers against
charter parties and ship owners, ship owners and those charter
parties who contracted directly with shippers have been found to
be jointly and severally liable.  See, e.g., Nissho-Iwai Co.,
Ltd v. M/T Stolt-Lion, 617 F.2d 907, 911-12 (2d Cir. 1980)
(finding that shipper had claim against ship owner as well as
the charterer under COGSA).

Defendants assert that the shipment of the subject cargo in
this case was a private carriage because the Akili was entirely
chartered out to one party, Seyang, and therefore not subject to
COGSA.  The plaintiff argues that COGSA does apply as the Akili
served as a common carrier, with Ferrostaal's shipments just a
few among several transported from China.

The plaintiff is correct.  Ferrostaal did not charter the
entirety of the Akili for its cargo and the Akili was held out
as a common carrier.  Therefore, COGSA applies to the subject
shipment.

The defendants' argument for why the subject shipment was a
private carriage rests chiefly on the fact that Akela had
chartered the entirety of the Akili to Seyang pursuant to the

---

[5]    As explained further below, this has been interpreted to
mean that COGSA is not applicable to the duties owed between
charterers that have chartered the entirety of a vessel and a
vessel owner.

Time Charter Party.  Indeed, under the law of this Circuit, when a single party charters the entirety of a vessel <u>for its own cargo</u>, the shipment is considered one of private carriage.  <u>See, e.g.</u>, <u>Koppers Connecticut Coke Co. v. James McWilliams Blue Line</u>, 89 F.2d 865, 866 (2d Cir. 1937) (Harter Act).  This is not the case here, as Ferrostaal did not charter the entirety of the vessel for the shipment of its goods.

Defendants rely on the holding in <u>The Toledo</u>, 30 F. Supp. 93 (E.D.N.Y. 1939), <u>aff'd</u>, 122 F.2d 255 (2d Cir. 1941), that when a dispute arises between a charterer and a vessel owner, the shipment is treated as a private carriage even "if the charterer chooses to put the ship on the berth and offer her to shippers as a common carrier."  <u>Id.</u> at 95.  <u>The Toledo</u>, however, found that the shipper's cargo claims, in contrast to those of the charterer, were governed by COGSA.  <u>Id.</u> at 98.  Similarly, here, the negotiated terms of the private charter between Akela and Seyang do not affect the duties owed by the defendants to shippers of public carriage such as Ferrostaal.[6]

No court in this Circuit has found that a shipment made pursuant to a voyage or time charter for only a portion of a

_____

[6]     This means that while defendants cannot rely on the charter between Akela and Seyang to deny application of COGSA to plaintiff's cargo, plaintiffs similarly cannot point to terms in that charter to ascribe duties to defendants that would not otherwise be due under COGSA.  <u>Madow Co. v. S.S. Liberty Exporter</u>, 569 F.2d 1183, 1186-87 (2d Cir. 1978).

vessel was a private carriage, even if the party with whom the shipper had contracted has itself chartered the entirety of the vessel.  In other words, the fact that a middle-man charterer may have a private-carriage relationship with the ship owner because it has chartered the whole vessel does not prevent a finding that the charterer and vessel serve as public carriers when they hold out their services to convey the cargo of numerous small-scale shippers.  As this Circuit has observed, "[i]n those private charter arrangements which are deemed to be outside the reach of COGSA, it is normally the shipper itself which is also the voyage or time charterer. . . . Nor is any shipper of only a portion of the cargo, as here, generally involved."  Madow, 569 F.2d at 1186-87.  Therefore, the subject cargo was public carriage and is governed by COGSA.

## II.  Carriers Under COGSA

Having established that COGSA applies in this case, it remains to be determined whether defendants qualify as "carriers" under the statute and therefore if they had a duty to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."  46 U.S.C. § 30701.  Since a carrier can include "the owner, manager, charterer, agent, or master of a vessel," each of the defendants may be a carrier by the language of the Act.  Id.

18

It is common for more than one party to be considered a
carrier and therefore liable for damage to cargo.  See, e.g.,
Nichimen, 462 at 325-29 (owner and time charterer carriers);
Demsey & Associates, Inc. v. Steamship Sea Star, 461 F.2d 1009,
1014-15 (2d Cir. 1972) (charterer and vessel carriers); Gans
S.S. Line v. Wilhelmsen, 275 F. 254, 262-63 (2d Cir. 1921)
(owner, time charterer and voyage charterer all carriers).  As
noted in Joo Seng Hong Kong Co., Ltd. v. S.S. Unibulkfir, 483 F.
Supp. 43 (S.D.N.Y. 1979), "there is strong statutory support for
treating, except in exceptional situations, all owners and
charterers involved in the carriage of goods at issue as COGSA
carriers who are potentially liable to cargo interests under the
bill of lading."  Id. at 46.  Accord Central National-Gottesman,
Inc. v. M.V. Gertrude Oldendorff, 204 F. Supp. 2d 675 (S.D.N.Y.
2002); 2 Admiralty & Mar. Law § 11-7 (4th ed. 2010).

A.   The Akili

The Akili, by setting sail with the cargo, is deemed to
have ratified the bill of lading, and therefore is liable in rem
as a carrier.  When a charterer issues a bill of lading, the
ship also becomes liable in rem because "[e]ven if the ship's
Master does not see the bill, he is fully aware that one must
exist; it is this awareness that underlies the ratification
doctrine."  Insurance Co. of North America v. S/S American
Argosy, 732 F.2d 299, 302-03 (2d Cir. 1984); see also Demsey,

461 F.2d at 1014-15.

        Defendants argue that for a ship to be liable <u>in rem</u> for damaged cargo, the issued bill of lading must serve as a contract of carriage, not as a mere receipt.  Defendants argue that the bill of lading in this case functioned only as a receipt because it was never transferred by Ferrostaal to any third party.  First, the bill of lading <u>was</u> transferred as part of the purchase order between the Chinese steel mill and Ferrostaal.  This purchase order's payment terms were for cash upon delivery of certain required documents, including the bill of lading.  Second, defendants' argument that the bill of lading in this case served only as a receipt merely repackages their public/private carriage argument.  The function of a bill of lading must be examined in the context in which it has been issued.  When issued as part of a shipment of public carriage, the bill of lading serves as a contract of carriage, document of title and a receipt, and so makes a vessel carrying the referenced cargo liable <u>in rem</u> for any damage incurred.  <u>See Associated Metals & Minerals Corp.</u>, 983 F.2d at 413; <u>Romano v. West India Fruit & S.S. Co.</u>, 151 F.2d 727, 730 (5th Cir. 1945); <u>Great American Ins. Co. v. M/V Handy Laker</u>, No. 96 Civ. 8737(BSJ), 97 Civ. 7400(BSJ), 2002 WL 32191640, at *14 (S.D.N.Y. Dec. 20, 2002).

        Defendants point to <u>Argosy</u>, 732 F.2d 299, for support that

a bill of lading issued by someone other than the ship's master cannot bind the ship. Argosy makes clear, however, that its holding is limited to situations where a shipper has contracted with a non-vessel operating carrier ("NVOCC") and there exist two bills of lading, one issued by the master and one by the NVOCC. Id. at 303. A vessel is fully aware that a charterer, who contracts for the use of the ship itself, will issue bills of lading that are ratified when the ship sets sail. Id.

Building on their erroneous assumption that the bill of lading functioned solely as a receipt and could not render the vessel liable in rem, defendants argue that the Voyage Charter Party between Ferrostaal and SM China also does not give rise to the Akili's in rem liability. Defendants point to the "FIO" (free in-out) term in clause 13 of that charter, under which Ferrostaal agreed to pay a freight rate of "$68.00 per MT FIO S/L/S/D 1-2," meaning that Ferrostaal had responsibility to pay for "cargo to be loaded, stowed, lashed, secured, and dunnaged." This argument ignores, first, the difference between payment for stowage and liability for improper stowage. Although Ferrostaal was responsible for payment under clause 13, clauses II.2 and 42 make clear that SM China, as "owner" under the Voyage Charter Party, retained responsibility and liability for improper stowage. Secondly, this argument ignores that the damage to the cargo did not result from any improper loading or stowage of

Ferrostaal's cargo, of which there was no evidence, but rather the stowage of heavy third-party cargo on top of Ferrostaal's thin-walled pipes.  Defendants have not alleged that Ferrostaal was responsible for the stowage of other shippers' cargo in the hold of the Akili.  Finally, responsibility for damage to cargo remained with the "carriers," including the Akili, under the terms of the Voyage Charter Party.  The charter explicitly incorporated the Hague-Visby rules -- which, as described above, are equivalent to those under COGSA for the purposes of this matter -- through the Clause Paramount in clause 58.  As described above, under COGSA, a vessel's duty to disclaim liability for improper stowage is severely circumscribed.

     B.   Akela and Almi

     On the other hand, Akela and Almi cannot be held personally liable, as neither authorized SM China to issue bills of lading on its behalf; nor would plaintiff have assumed that such authorization existed, as the bill of lading clearly names only SM China as carrier and does not purport to be a document signed "for the master."  See Demsey, 461 F.2d at 1015; Yeramex Intern. v. S.S. Tendo, 595 F.2d 943, 948 (4th Cir. 1979) (finding that ship owner could not be made personally liable when charterer had no actual or apparent authority to so bind it).  These entities

were not parties to the contracts of carriage with

> plaintiffs and did not sign the bills of lading.
> Furthermore, they had nothing to do with soliciting
> shippers or directing the vessel.  Some connection
> with the shippers or contract of carriage generally
> has been required as a prerequisite to the imposition
> of liability on the owner and charterer in addition
> to the voyage charterer.

Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 594 F.
Supp. 1490, 1498 (S.D.N.Y. 1984) (citation omitted) (finding the
sub-charterer personally liable and the ship liable in rem, but
that the ship owner and intermediate charter were not personally
liable as they were not carriers under COGSA).

Plaintiff argues that the terms of the Voyage Charter Party
between Ferrostaal and SM China assign liability for improper
stowage on Akela because under Clause 42 of that document,
"[s]towage, lashing and securing to be done to Master's
satisfaction and under his supervision as agent and servant of
the owner under owner's sole responsibility." (Emphasis
supplied.)  This argument would be persuasive if the "owner"
referred to in the Voyage Charter Party was Akela.  But, it is
not.  Clause 3 of that document defines "owner" as "SM China,"
not Akela.

Plaintiff also suggests that the Akela can be held liable
under a bailment or tort theory even if it is not liable as a
carrier under COGSA.  One can bring an action for damage to
cargo under both COGSA and under a theory of bailment.  See
Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard

Co., Ltd., 426 F.3d 580, 587 n.3 (2d Cir. 2005); Nichimen, 462 F.2d at 325 n.1.  Plaintiff must first establish that there was a bailment relationship between it and the ship owner.  A "bailment does not arise unless delivery to the bailee is complete and he has exclusive possession of the bailed property."  Thyssen Steel Co. v. M/V Kavo Yerakas, 50 F.3d 1349, 1355 (5th Cir. 1995).  Therefore, when a charterer has taken responsibility for stowage of cargo onboard a ship, the ship owner does not have exclusive possession of the property and so cannot be held liable as a bailee.  Id. at 1354-55.

Captain Zhong, the supercargo and an employee of SM China, not Akela, was responsible for decisions of stowage of cargo. Lu, plaintiff's surveyor, testified that he never brought his concerns about improper stowage to the attention of the ship's captain or anyone other than Zhong.  There is no evidence that Akela undertook to have possession over plaintiff's cargo, and is accordingly not personally liable for damage to the cargo under a theory of bailment.[7]  This result necessarily results in a verdict in favor of Almi, whose liability rests on its agency relationship with Akela.

---

[7]     Defendants suggest that when a ship owner is not personally liable for damage to cargo because the bill of lading issued by the charterer did not purport to bind it, the vessel should also not be liable in rem.  This argument is not supported by any case law in this circuit.  See Demsey, 461 F.2d at 1014-15.

III. Establishing a Claim Under COGSA

To establish a prima facie case under COGSA, the plaintiff must demonstrate that the cargo was damaged "while in the custody" of the carrier. Thyssen v. Eurounity, 21 F.3d 533, 538 (2d Cir. 1994). "[T]his burden can be met by proving (1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition." Bally, Inc. v. M.V. Zim America, 22 F.3d 65, 69, (2d Cir. 1994) (citation omitted). "Outturn" occurs at the time of delivery of the cargo. Id. In meeting its initial burden of showing "that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo," the plaintiff may make its showing through direct or circumstantial evidence. Siderius v. M.V. Amilla, 880 F.2d 662, 664 (2d Cir. 1989) (citation omitted). An "inherent vice" is "any existing defect, disease, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." Raphaely Int'l, Inc. v. Watermon S.S. Corp., 972 F.2d 498, 504 (2d Cir. 1993).

The carrier's bill of lading often plays a large role in establishing delivery of the goods to the carrier in good condition. "[T]he issuance of a clean bill of lading creates a presumption of delivery in good condition favorable to the plaintiff." Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir. 1998). A carrier is

25

presumed to have confirmed any attribute indicated on the bill
of lading, and to the extent that the carrier is unable to
confirm an attribute of the goods, the carrier may by statute
refuse to list that attribute on the bill of lading.  46 U.S.C.
§ 30701.

Defendants have conceded that the damage to plaintiff's
cargo is the result of improper stowage onboard the Akili.  Even
without this concession, the plaintiff has met its burden of
establishing a prima facie case for liability under COGSA.
There is no evidence whatsoever that there was any harm or
damage to the goods when they were delivered to the port for
loading on board the vessel.  To the contrary, the testimony of
Lu, his report and photographs make clear that prior to loading
the pipes were in good condition.  Lu's report also confirms
that nothing occurred during loading that might have caused
damage to Ferrostaal's cargo.

In contrast, the testimony of Salkeld and Calima show that
upon arrival in the United States, many of the pipes had
suffered damage making them unfit for their intended purpose
without expensive repairs.  The type of damage incurred was
consistent with Lu's concerns about the stowage plan onboard the
Akili, as well as the observations of Salkeld, including his
reports of crushed dunnage, scored bulkheads and the particular
pattern of damage seen on the pipes.  Of course, even without

this circumstantial evidence of causation, plaintiff has more than met its burden, which was merely to show that goods were delivered to the carrier in good condition, and discharged in damaged condition. Bally, 22 F.3d at 69.

Once the plaintiff has made out a prima facie case, the burden shifts to a defendant to prove that the damage did not occur on board the vessel. Siderius, 880 F.2d at 664. Defendants have not offered any such evidence. While defendants alluded to a lack of plastic pipe-end caps, it is undisputed that these plastic caps were not designed to prevent the type of damage suffered by Ferrostaal's cargo. In sum, plaintiff has carried its burden of establishing by a preponderance of the evidence that a valid COGSA claim exists against the Akili, which is liable in rem.

IV. Damages

In the ordinary case, the appropriate calculation of damages is the difference between the fair market value of the goods at their destination "in the condition in which they should have arrived" and "the condition in which they actually did arrive." Texport Oil Co. v. M/V Amolyntos, 11 F.3d 361, 365 (2d Cir. 1993). But, incidental damages may be a more accurate measure of damages when damaged goods are repaired. Id. (finding that damages can be found from loss of fair market value plus incidental damage incurred to restore value to

27

cargo).

Plaintiff has asked for damages in the amount of $313,429.96, but this number does not reflect precisely the figures for losses and expenses presented in the evidence. Plaintiff has presented evidence that the diminution of value of its cargo amounts to $637.38, and the cost of its repairs and other costs to restore the remainder of the pipe was $312,736.11.   Therefore, its damages total $313,373.49.

"In this Circuit, prejudgment interest will be denied in admiralty cases only under extraordinary circumstances." Federal Ins. Co. v. Sabine Towing & Transp. Co., Inc., 783 F.2d 347, 352 n.4 (2d Cir. 1986).   There are no exceptional circumstances here, so plaintiff is entitled to prejudgment interest.

District courts in this circuit have broad discretion to fix both the rate of prejudgment interest and the date when such interest begins.   Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse, 996 F.2d 506, 520 (2d Cir. 1993); Independent Bulk Transport, Inc. v. Vessel Morania Abaco, 676 F.2d 23, 25 (2d Cir. 1982). Although plaintiff suggests a rate of 9%, an award of interest based on the average annual United States Treasury Bill rate is becoming more common in this Circuit.   "The [treasury bill] rate more closely parallels the income the damages would have earned in a short-term, risk-free investment."   Dessert Service

Incorporated v. M/V MSC Jamie/Rafaela, 219 F. Supp. 2d 504, 509
(S.D.N.Y. 2002); accord Central Hudson Gas & Elec. Corp. v. The
Tug M/V Scott Turecamo, 496 F. Supp. 2d 331 (S.D.N.Y. 2007); see
also Independent Bulk Transport, 676 F.2d at 27 ("Plaintiff is
entitled to the income which the monetary damages would have
earned, and that should be measured by interest on short-term,
risk-free obligations").

Interest is intended as a cure for an actual loss of cash,
and so should run from the time that the loss took place, which
is the expected date of delivery of the damaged or lost cargo.
See Mitsui & Co., Ltd. v. American Export Lines, Inc., 636 F.2d
807, 824 (2d Cir. 1981).  The Akili discharged plaintiff's cargo
in New Orleans on September 9, 2006, but the cargo was not
delivered to Ferrostaal's care until October 17, 2006, after it
had been shipped upriver by barge to Pennsylvania.  This latter
date, and not September 9, is when prejudgment interest should
commence.  Earlier than October 17, plaintiff had no expectation
that they would have use of the cargo, and therefore no loss.
Ferrostaal is accordingly entitled to compound prejudgment
interest running from October 17, 2006, at the average annual
Treasury bill rate of 2.236%.[8]

---

[8]   See generally http://www.treasury.gov/resource-center/data-
chart-center/interest-rates/Pages/Historic-LongTerm-Rate-Data-
Visualization.aspx (providing data on historical United States
treasury bill rates)

CONCLUSION

Plaintiff has carried its burden in showing that it has a claim for damage of cargo under COGSA against the Akili, which is liable in rem.  The claims of personal liability against Akela and Almi, which are not carriers under COGSA, are dismissed.  The plaintiff shall present a proposed judgment reflecting these rulings by January 31, 2011.


SO ORDERED:

Dated:    New York, New York
          January 24, 2011

                                    _____
                                         DENISE COTE
                                United States District Judge